# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### (Norfolk Division)

| | |
|---|---|
| **AUDIO MPEG, INC., U.S. PHILIPS CORPORATION, ORANGE SA, TDF SAS, and INSTITUT FÜR RUNDFUNKTECHNIK GMBH,** | |
| **Plaintiffs and Counterclaim Defendants,** | **2:15-cv-00073-HCM-RJK** |
| **v.** | |
| **HP INC.,** | |
| **Defendant and Counterclaim Plaintiff,** | |
| **v.** | |
| **SOCIETÀ ITALIANA PER LO SVILUPPO DELL'ELETTRONICA SPA and SISVEL US,** | |
| **Third-Party Defendants.** | |
| **AUDIO MPEG, INC., U.S. PHILIPS CORPORATION, TDF SAS, and INSTITUT FÜR RUNDFUNKTECHNIK GMBH,** | |
| **Plaintiffs,** | **2:16-cv-00082-HCM-RJK** |
| **v.** | |
| **DELL INC.,** | |
| **Defendant.** | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT DELL INC.'S MOTION TO DISMISS

March 31, 2016

Plaintiffs Audio MPEG, Inc. ("Audio MPEG"), U.S. Philips Corporation ("Philips"), TDF SAS ("TDF"), and Institut Für Rundfunktechnik GMBH ("IRT") respectfully oppose defendant Dell Inc.'s ("Dell") motion to dismiss ("Motion") for the reasons set forth below.[1]

## PRELIMINARY STATEMENT

Dell's Motion is nothing more than another inappropriate attempt to avoid the consequences of Dell's long-standing knowing and willful infringement of Plaintiffs' patented technologies. The Motion is based almost entirely on disagreements with the facts alleged in the Complaint, and should be denied for several reasons.

*First*, Dell mischaracterizes Plaintiffs' patents as directed to a "formula" or "signals," and as only "*mention[ing]* generic 'decoders and receivers.'" (Mot. at 10 (emphasis added).) In fact, the concrete "decoders" or "receivers"—apparatuses that can decode audio signals that have been compressed in a particular way—are precisely what the patents-in-suit claim. (*See* Compl. ¶¶ 29, 32-35, 39-40.) This mischaracterization—which may later be addressed at the *Markman* hearing—is significant, because the same authority that Dell cites for the proposition that "signals" are not patentable acknowledges the patentability of what the patents-in-suit actually claim: an apparatus for receiving signals. *See In re Nuijten*, 500 F.3d 1346, 1351 (Fed. Cir. 2007). Dell also relies heavily on inapposite decisions regarding business-method claims. Such decisions have rightly held, in the wake of the Supreme Court's landmark decision in *Alice Corp. Pty. Ltd.* v. *CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014), that abstract business processes that "merely recite the performance of some business practice known from the pre-Internet world

---

[1]     Philips, TDF, and IRT are referred to collectively as the "Patent Owners." Together, the Patent Owners and Audio MPEG are referred to as "Plaintiffs." This memorandum refers to the patents-in-suit owned by the Patent Owners and licensed by Audio MPEG as "Plaintiffs' patents."

along with the requirement to perform it on the Internet" do not thus become patentable. *DDR Holdings, LLC* v. *Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). Such abstract claims bear no relationship to the Patent Owners' inventions, which solved problems specific to the realm of storing and transmitting data-intensive digital audio signals. Claims solving those quintessential problems are patentable because such claims "necessarily [are] rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* As such, the subject matter of Plaintiffs' claims is precisely the sort of "improved, particularized method of digital data compression" that the Federal Circuit has deemed patentable post-*Alice*. *Id.* at 1259.

*Second*, Dell's argument that the claims of the Asserted Patents are indefinite is at best premature because the Court has not yet construed the claims following a *Markman* hearing. The Federal Circuit has repeatedly held that the determination of whether a claim is indefinite requires a construction of the claims. Claim construction, in turn, requires a properly developed record, including expert testimony. There is, of course, no evidentiary record for this motion to dismiss, which must be decided on the pleadings. Dell is free to raise its baseless indefiniteness arguments after a *Markman* hearing and claim construction, when the fully developed record will show that the claims are not indefinite.

*Third*, contrary to Dell's motion, the Complaint has pled both direct and indirect infringement well beyond the threshold of "plausibility." Dell does not dispute that "a district court may rely on an industry standard in analyzing infringement." *Fujitsu Ltd.* v. *Netgear Inc.*, 620 F.3d 1321, 1327 (Fed. Cir. 2010). Dell argues in its motion to dismiss that the industry standards at issue here are not sufficiently specific to establish that the patents are essential. But the Complaint alleges that the patents are essential to the standards, and Dell does not dispute

that Dell's products comply with the standards. These allegations must be taken as true for purposes of this Motion, and they are sufficient as a matter of law to plead infringement. Likewise, Dell's arguments that Plaintiffs' indirect infringement theories are inadequately pled ignore the plain language of plausible allegations made by Plaintiffs. Finally, in arguing that Plaintiffs have not adequately pled willful infringement, Dell incorrectly relies on the standard for *proving* willful infringement rather than the standard for *pleading* willful infringement.

At base, Dell's Motion is without support and is premature in the extreme. For these and the other reasons discussed below, the Court should deny Dell's Motion.

## STATEMENT OF FACTS

This action relates to patents claiming technologies adopted in the ISO 11172-3 and ISO 13818-3 industry standards directed to MPEG Audio Layers 1, 2, and 3 technology (the "MPEG Standards," with the latter "Layer III" also known as "MP3"). (Compl. ¶¶ 21-22.) MP3 and its related MPEG standards are audio compression standards that allow wideband audio signals— signals that can include a wide range of frequencies—to be compressed and stored using much less space than previous technologies. (*Id.* ¶ 22.) MP3 allows audio signals to be "encoded"— *i.e.*, compressed—and then "decoded"—*i.e.*, converted back into an audio signal. (*Id.*) The technology allows high-quality audio to be transmitted and stored using less bandwidth and few digital bits, saving bandwidth, storage capacity on devices, and battery life—among other advantages.

In the early 1980s, radio and television equipment manufacturers and broadcasting companies (such as the Patent Owners) began inventing various digital compression techniques that took advantage of scientific research on the limitations of the human auditory system, and used those limitations to conserve data bandwidth by discarding data that was "irrelevant"—*i.e.*,

inaudible—to the average human listener.[2]  In the late 1980s, a Motion Picture Expert Group ("MPEG") Working Group was set up under the auspices of the International Organization for Standardization ("ISO").  (*Id.* ¶ 20.)  The working group established a competition to solicit proposals for new audio compression technologies, and to select among those proposals to improve digital audio devices.  (*See id.*)

The technology underlying the MPEG Standards (and MP3) was developed by various parties, including an unusual inventive collaboration among the Patent Owners participating jointly in a subcommittee of the ISO MPEG Working Group.  (*Id.* ¶¶ 19-20.)  As a result of their joint collaboration, they drafted a brand new and novel proposal for compressing digital audio. Aspects of that proposal were chosen by the MPEG Working Group for incorporation into the MPEG Standards it developed.  (*Id.* ¶ 20.)  The work of the ISO MPEG Working Group was embodied in the two MPEG Standards, which were finalized in 1991.  (*Id.* ¶ 21.)

The Patent Owners now own patents that claim inventions "that are essential— required—for implementation of the MPEG Standards."  (*Id.* ¶ 25.)  These include the U.S. patents asserted in this action, U.S. Patent Nos. 5,777,992 (the "'992 Patent"), 5,323,396 (the "'396 Patent"), and 5,539,829 (the "'829 Patent") (collectively, the "Asserted Patents" or "patents-in-suit"), all of which have expired.  (*Id.* ¶ 24.)[3]  "Products using MPEG Audio compression by compliance with the MPEG Standards necessarily use the technology of the Asserted Patents in order to be in compliance with the Standards and achieve the benefits of the

---

[2]     Compression schema that conserve bandwidth in that way are referred to as "psychoacoustic" compression techniques.

[3]     Plaintiff Audio MPEG has the exclusive rights to license and to bring claims upon the Asserted Patents with respect to products implementing the MPEG Standards.  (Compl. ¶ 41.)

Standards.  Products compliant with the MPEG Standards therefore practice the technology claimed by the Asserted Patents." (*Id.*)

Over the last decade and into the present, Plaintiffs' technologies have been widely used in devices that store, organize, and play digital music files, including the MP3 files that became the de-facto standard for digital audio compression in the transfer and playback of music on digital audio players, and digital video.

Claims of all of the Asserted Patents relate to decoding compressed signals that represent wideband digital audio signals.  (*Id.* ¶¶ 27, 31, 37.)  The '396 and '992 Patents relate to the format in which the wideband digital signal is transmitted.  The problem addressed by these patents was the need for a transmitter and receiver "capable of converting wide-band digital signals of different formats." (*E.g.*, Compl. Ex. A ('396 Patent), Dkt. 1-1, col. 2:15-23.)  At the time, "a flexible and highly versatile transmission system" was needed that would encode audio that used different sampling frequencies.  (*Id.* col. 2:9-15.)  "The versatility and flexibility of the [invention] thus resides in the special format with which the information in the form of the second digital signal [i.e., the encoded signal] is transmitted . . . ." (*Id.* col. 6:4-7.)

More specifically, the '396 Patent describes decoders and receivers in which information is transmitted to, and decoded by, the decoder/receiver in "frames" at a particular rate.  (Compl. ¶ 28.)  Claim 26 of the '396 Patent claims a formula for calculating the number of information packets in one frame, and it claims the ability to decode content that is structured according to the formula.  (*Id.* ¶ 29.)  Claims 1, 2, 7, and 10 of the '992 Patent claim similar subject matter. (*Id.* ¶¶ 33-35.)  These features are present in the MPEG Standards, including Section 2.4.3.1 of ISO/IEC 11172-3, and they are also essential to the Standards, such that any decoder that

complies with the MPEG Standards must be capable of decoding packets and frames in accordance with the foregoing claims.  (*Id.* ¶¶ 28, 32-35.)

The '829 Patent claims an invention known as "intensity stereo," which includes an apparatus configured to make a signal replica more accurate.  (Compl. ¶ 38.)  The technology claimed in the '829 Patent does this by combining certain related sub-bands (such as those that correspond to the left and right channel in the same frequency sub-band) and using the bits thus saved to more accurately quantize the other sub-bands.  (*Id.*)  As its specification explains, "[b]y selectively combining subsignals which have a correspondence or relationship to each other, and quantizing only one composite sub-signal," the invention "make[s] more bits available for quantizing of those sub-signals which are transmitted," which reduces distortion and "may more than compensate for the slight loss of information."  (Compl. Ex. C ('829 Patent), Dkt. 1-3, col. 2:52-57.)  The method of combining signals "takes advantage of the fact that the human ear is less phase sensitive in [certain] frequency bands."  (*Id.* col. 3:39-41.)  Claims of the '829 Patent are essential to the MPEG Standards.  (Compl. ¶¶ 39-40.)

Since the Asserted Patents were issued, the claimed technology has been responsible for an incredibly successful revolution of digital products, ranging from digital radio and digital video broadcast transmission formats and digital compact cassettes to the audio of the DVD encoding format and the ubiquitous MP3 player, which has revolutionized how music is transmitted, stored, and played.  The technology has allowed consumers to listen to entire libraries of music of their choice, on-demand.  To date, more than 1,000 manufacturers and sellers of MP3-enabled products have taken the license offered by Audio MPEG (which includes the patents-in-suit), including major players in the industry such as Sony, Apple, Lenovo, Samsung, Cisco-Linksys, LG, Panasonic, Sharp, and Bose.  (*Id.* ¶ 43.)  Despite selling computers

containing MP3-capable technology, the "receivers" and "decoders" of the claims, Dell has never taken a license to the Asserted Patents.

## ARGUMENT

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint "state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555. "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted). "When ruling on a Rule 12(b)(6) motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co.* v. *Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

Prior to the amendments to the Federal Rules of Civil Procedure effective December 1, 2015, Rule 84 stated that "[t]he forms in the Appendix" to the Rules—including Form 18, a model complaint for patent infringement—"suffice under these rules and illustrate the simplicity and brevity that these rules contemplate." Recognizing that the bare allegations of Form 18 were arguably deficient under *Twombly*, the Federal Circuit previously held that "to the extent the parties argue that *Twombly* and its progeny conflict with the Forms and create differing pleadings requirements, the Forms control." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1334 (Fed. Cir. 2012). Rule 84 and Form 18 have since been abrogated by the recent amendments to the Rule. At most, the amendments clarify that patent infringement

claims are subject to the pleading standard of *Twombly*;[4] there can be no dispute that a pleading that satisfies *Twombly* is sufficient to state a claim for patent infringement.

## I.      THE ASSERTED PATENTS CLAIM PATENT-ELIGIBLE SUBJECT MATTER.

Under 35 U.S.C. § 101, an inventor may obtain a patent for "any new and useful process, machine, manufacture, or composition of matter."  Excluded from patent protection are "laws of nature, natural phenomena, and abstract ideas."  *Diamond* v. *Diehr*, 450 U.S. 175, 185 (1981).  "[T]he concern that drives this exclusionary principle [i]s one of pre-emption," that is, "that patent law not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity."  *Alice*, 134 S. Ct. at 2354 (internal quotation marks omitted).  The Supreme Court has recognized, however, that "too broad an interpretation of this exclusionary principle could eviscerate patent law" because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."  *Mayo Collaborative Servs.* v. *Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012).

Accordingly, "an invention is not rendered ineligible for patent simply because it involves an abstract concept."  *Alice*, 134 S. Ct. at 2354.  "[A]n *application* of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection."  *Diehr*, 450 U.S. at 187 (emphasis in original).  The abstract-ideas exception does not apply if the claimed invention "solve[s] a technological problem in 'conventional industry practice,'" "improve[s] an existing technological process," or otherwise "effect[s] an improvement in any other technology or technical field."  *Alice*, 134 S. Ct. at 2358-59.

---

[4]      However, the Advisory Committee stated that the "abrogation . . . does not alter existing pleading standards or otherwise change the requirements of Civil Rule 8."  Fed. R. Civ. P. 84 Advisory Committee's 2015 Amendment Note.

The Supreme Court has established a two-step framework for "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Id.* at 2355.  First, a court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts[:]"  laws of nature, natural phenomena, or abstract ideas. *Id.*  Second, the court must "search for an 'inventive concept'— *i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (internal quotation marks omitted).

A party "seeking to establish that particular claims are invalid must overcome the presumption of validity in 35 U.S.C. § 282 by clear and convincing evidence." *CertusView Techs., LLC* v. *S & N Locating Servs., LLC*, 111 F. Supp. 3d 688, 706 (E.D. Va. 2015). Moreover, the Federal Circuit has cautioned that "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Servs., LLC* v. *Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012).  For these reasons, courts often decline to resolve challenges under Section 101 on a motion to dismiss.

### A.    The Asserted Patents Claim Patentable Subject Matter.

Dell's assertion that "the Asserted Patents . . . do not fit in any of the four statutorily eligible categories" because the "Asserted Patents claim only 'signals' that are 'encoded in accordance with a given encoding process'" (Mot. at 9-10) severely mischaracterizes the subject matter claimed by the Asserted Patents.  For example, Claim 26 of the '396 Patent claims "[a] *receiver* for receiving wide-band digital information."  (Compl. Ex. A ('396 Patent) (emphasis added).)  Claims 1, 2, 7, and 10 of the '992 Patent claim "*decoder*[s] for decoding an encoded

digital signal." (Compl. Ex. B ('992 Patent), Dkt. 1-2 (emphasis added).) Likewise, Claims 19 and 20 of the '829 Patent claim "[a] *receiver* for producing a replica of a digital signal." (Compl. Ex. C ('829 Patent) (emphasis added).) The Asserted Patents thus indisputably claim not mere "signals," but machines that process signals. This is in stark contrast to the patent claims at issue in *Nuijten*, 500 F.3d at 1351—the principal case upon which Dell relies—in which "[t]he [only] claims on appeal s[ought] to cover the resulting encoded signals *themselves*."[5]

### B.    The Asserted Patents Do Not Merely Claim Abstract Ideas.

Dell also argues that, even if the claims of the Asserted Patents fall within one of the four categories of patentable subject matter, "they nevertheless would be invalid" because they claim an abstract idea. (Mot. at 11.) According to Dell, "the Asserted Patents claim only well-established abstract concepts of receiving and outputting information in a specified format." (Mot at 12.) But at Dell's level of generalization, every patent covers only abstract ideas. Indeed, the Federal Circuit has recognized that "any claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed." *Ultramercial, Inc.* v. *Hulu, LLC*, 722 F.3d 1335, 1344 (Fed. Cir. 2013), *cert. granted, judgment vacated sub nom. WildTangent, Inc.* v.

---

[5]    Contrary to Dell's argument, *Nuijten* confirms the patentability of Plaintiffs' claims. *See* 500 F.3d at 1351 (acknowledging the patentability of claims directed to an "apparatus for . . . *receiving* . . . the signals") (emphasis added). The patent application in *Nuijten* involved "a technique for reducing distortion induced by the introduction of 'watermarks' into signals." 500 F.3d at 1348. The Patent and Trademark Office "*allowed* claims to the process [the patent owner] invented, a device that performs that process, and a storage medium holding the resulting signals." *Id.* at 1351 (emphasis added). "None of th[o]se claims [was] before" the Federal Circuit in the opinion cited by Dell. *Id.* Indeed, the court emphasized that the claims on appeal were *not* "directed to any apparatus for generating, receiving, processing, or storing the signals" because "*such claims have been allowed*." *Id.* (emphasis added).

*Ultramercial, LLC*, 134 S. Ct. 2870 (2014).[6]  Here, contrary to Dell's characterization, the claims do not broadly cover the general idea of "receiving and outputting information in a specified format."  (Mot. at 12.)  Rather, the inventors claim a receiver/decoder configured to use one particular format, and the format itself was invented by the inventors to improve the function of the device.[7]

Thus, even if the Asserted Patents include an abstract idea, the claims are patentable because they contain "inventive concept[s] sufficient to transform the claimed abstract idea[s] into . . . patent-eligible" inventions.  *Alice*, 134 S. Ct. at 2357 (internal quotation marks omitted).  "A claim that recites an abstract idea must include additional features to ensure that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]."  *Id.* (internal quotation marks omitted).

The Supreme Court's foundational decision in *Diehr* is instructive.  In *Diehr*, the Court considered "whether a process for curing synthetic rubber which includes in several of its steps

---

[6]     The authorities cited by Dell do not support its broad assertion that "[t]he Federal Circuit . . . has held that 'receiving' information is abstract" (Mot. at 12).  In *Cyberfone Systems, LLC* v. *CNN Interactive Group, Inc.*, 558 Fed. App'x 988, 992 (Fed. Cir. 2014) (Mot. at 12), the patent claims were not directed to receiving information, but to "the well-known concept of categorical data storage, *i.e.*, the idea of collecting information in classified form, then separating and transmitting that information according to its classification."  Likewise, in *Digitech Image Technologies, LLC* v. *Electronics for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014) (Mot. at 12), the Federal Circuit considered claims directed to "a collection of intangible color and spatial information" and found that subject matter ineligible.  These abstract ideas are not comparable to the digital compression technology covered by the Asserted Patents.

[7]     As the court explained in *Paone* v. *Broadcom Corp.,* 2015 WL 4988279, at *10 (E.D.N.Y. Aug. 19, 2015) in the context of encryption technology, the fact that an invention can be broadly generalized to incorporate an abstract idea does not render it unpatentable.  In *Paone*, it was of no moment that "[e]ncryption, in general, represents a basic building block of human ingenuity that has been used for hundreds, if not thousands, of years.  That is because [U.S. Patent No. 6,259,789] does not claim a process that can or does *involve* the encryption of data for some purpose that is otherwise abstract.  Rather, it claims a specific method of doing so."  *Id.* at *7 (internal quotation marks and citations omitted).

the use of a mathematical formula and a programmed digital computer is patentable subject matter." 450 U.S. at 177. At the time *Diehr* was decided, the rubber industry knew, based on a mathematical formula known as the Arrhenius equation, how to calculate the optimal time to open a rubber mold to achieve the perfect cure. *Id.* at 177-78. This formula included several variables, including the temperature inside the press. Despite this knowledge, the industry was unable to obtain "uniformly accurate cures" because it could not precisely calculate the temperature inside the press. *Id.* at 178. The patent at issue in *Diehr* involved the use of a computer to solve this problem. More specifically, the patent claimed a process for "constantly measuring the actual temperature inside the mold" and automatically feeding those measurements into a computer, which "repeatedly recalculate[d] the cure time by use of the Arrhenius equation." *Id.* The Court held that these claims were patentable, explaining that "the respondents here do not seek to patent a mathematical formula" but instead "seek patent protection for a process of curing synthetic rubber." *Id.* at 187. "Arrhenius' equation is not patentable in isolation, but when a process for curing rubber is devised which incorporates in it a more efficient solution of the equation, that process is at the very least not barred at the threshold by § 101." *Id.* at 188. The Supreme Court has since confirmed the validity of this holding, explaining that "the claims in *Diehr* were patent eligible because they improved an existing technological process." *Alice*, 134 S. Ct. at 2358.

Like the claims in *Diehr*, the claims of the Asserted Patents are patentable because they do not seek to patent a particular abstract idea, but rather seek patent protection for a device which incorporates the format developed by the inventors into a particular device which operates more flexibly and efficiently than the prior art. The claimed devices "solve a technological problem in 'conventional industry practice'" and/or "improve[] an existing technological

process." *Alice*, 134 S. Ct. at 2358-59 (emphasis omitted).  The '396 and '992 Patents, for example, claim a receiver or decoder capable of decoding information that is in a specified format; the use of this format makes the device itself more efficient and flexible than prior receivers because, among other things, the particular format allows the device to process signals based on a variety of sample frequencies and bit-rates.  (*See, e.g.*, Compl. Ex. B ('992 Patent) at 6:29-32 & Figs. 5 & 6.)  As the patent specification explains, "[t]he versatility and flexibility of the decoder thus resides in the specific format with which the information . . . is transmitted." (*Id.* at 4:10-12).

Likewise, the '829 Patent covers an apparatus configured to make the signal replica more realistic by taking into account the hearing capabilities of the human ear at different frequencies, and by coding the most important frequencies as accurately as possible, and coding less critical frequencies less precisely.  As its specification explains, the "invention is based on the recognition that the numbers of bits made available for different sub-signals [frequency bands] are not optimally allocated [in prior art devices] so that quantization of certain sub-signals is too rough."  (Compl. Ex. C ('829 Patent) at 2:47-50.)  In the invention claimed in the '829 Patent, "[b]y selectively combining subsignals which have a correspondence or relationship to each other, and quantizing only one composite sub-signal, so as to make more bits available for quantizing of those sub-signals which are transmitted, the reduced quantizing distortion may more than compensate for the slight loss of information in the [reproduced signal]." (*Id.* at 2:51-57.)

Because the claims of the Asserted Patents claim technological apparatuses, the business method cases cited by Dell are inapposite.  Dell cites these cases for the proposition that "the inventive concept requirement is not met by 'a computer [that] receives and sends the

information over a network – with no further specification.'" (Mot. at 14 (citing *BuySafe, Inc.* v. *Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014)).) But the Federal Circuit has recognized a distinction between claims that "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet"—which are not patentable—and claims that are "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks"—which are patentable. *DDR*, 773 F.3d at 1257.

The cases cited by Dell largely fall into *DDR*'s first category because the claims at issue were directed towards methods for using a computer to perform tasks that have long been performed without a computer. For example, *Content Extraction & Transmission LLC* v. *Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) involved a patent claiming "the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." As the Federal Circuit recognized, these are "undisputedly well-known" functions that "humans have always performed." *Id.*[8]

By contrast, the Asserted Patents fall into *DDR*'s second category—inventions that use computers to solve problems arising in the field of computer technology. For example, in *TQP Development, LLC* v. *Intuit Inc.*, 2014 WL 651935, at *7 (E.D. Tex. Feb. 19, 2014), the claim was patentable because it involved "a method for changing data in a way that will affect the

---

[8]     *See also Digitech*, 758 F.3d at 1347 (patent "directed to the generation and use of an 'improved device profile' that describes spatial and color properties of a device within a digital image processing system"); *Cyberfone*, 558 Fed. App'x at 992 (patent directed to "using categories to organize, store, and transmit information"); *Compression Tech. Solutions LLC* v. *EMC Corp.*, 2013 WL 2368039, at *1 (N.D. Cal. May 29, 2013) ("method and apparatus claims directed to parsing information into packets based upon 'context-insensitive' parsing"); *Accenture Global Servs., GmbH* v. *Guidewire Software, Inc.*, 800 F. Supp. 2d 613, 621 (D. Del. 2011) (patents directed to "methods and systems for generating file notes and tasks to be performed for insurance claims").

communication system itself," *not* "a method of doing business that happens to be implemented on a computer."  The court described the claimed invention as "a way of making computer communication itself more effective," such as "by making that communication more secure." *Id.*; *see also France Telecom S.A.* v. *Marvell Semiconductor Inc.*, 39 F. Supp. 3d 1080, 1097 (N.D. Cal. 2014) (following *TQP Development* where patent involved "a method for more accurate and efficient data transmission").  Similarly, the Asserted Patents cover inventions that make the transmission and receipt of compressed digital audio signals far more efficient.

Finally, Dell ignores that the Federal Circuit has specifically recognized digital data compression as an example of a patentable invention directed to more than an abstract concept.[9] In *DDR*, the Federal Circuit found that the claims were "unlike the claims in *Alice* [and other cases] that were found to be 'directed to' little more than an abstract concept."  773 F.3d at 1259. The court explained:

> To be sure, the '399 patent's claims do not recite an invention as technologically complex as an *improved, particularized method of digital data compression*.  But nor do they recite a commonplace business method aimed at processing business information, applying a known business process to the particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operations . . . .

*Id.* (emphasis added); *see also Bilski* v. *Kappos*, 561 U.S. 593, 605 (2010) (rejecting "machine-or-transformation test" as dispositive because that test "would create uncertainty as to the patentability of . . . data compression[] and the manipulation of digital signals").  The claims at

---

[9]     In *Compression Technology*, 2013 WL 2368039, at *5 (Mot. at 12), the court found patents related to digital compression ineligible, but those claims were so broad that "all of the steps . . . c[ould] be completed entirely in the human mind."  Indeed, the court noted that "someone interpreting Morse code" would be practicing the invention covered by the patent. *Compression Tech.*, 2013 WL 2368039, at *5.  These are distinct from the narrower claims at issue here, which seek to solve a technological problem in conventional industry practice.

issue here—also directed to digital data compression—similarly are directed to more than an abstract concept.

## II.  THE COURT SHOULD CONSTRUE THE CLAIMS BEFORE CONSIDERING WHETHER THEY ARE INDEFINITE.

Dell argues that the Complaint should be dismissed because, it contends, the asserted claims of the Asserted Patent are indefinite, and therefore invalid. (Mot. at 15.)  In addition to being wrong on the merits, Dell's argument is premature because courts have consistently held that analysis of whether a claim is indefinite requires claim construction, a process the parties have not even begun.  The validity of the claims is presumed by statute.  35 U.S.C. § 282.  It should not, and cannot, be decided on a motion to dismiss before the Court has construed the claims to determine their scope and meaning.

Dell's indefiniteness argument is premised on two grounds.  First, Dell asserts that the claims of the '396 and '992 Patents are indefinite because both require that "the average frame rate of the encoded digital signal is substantially equal to $F_s/n_s$." (Mot. at 16.)  Dell claims that "[n]othing in the Asserted Patents tells a person of ordinary skill in the art the meaning of 'substantially equal to' in the claims." (*Id.* at 17.)  Second, Dell contends that certain limitations in the '992 and '829 Patents are "means plus function" elements under 35 U.S.C. § 112 ¶ 6.  It claims that these limitation are indefinite because they "lack any corresponding structure in the specification." (*Id.* at 19.)

Dell's arguments are, at best, premature, because the claims of the Asserted Patents have not yet been construed.  "A claim must be construed before determining its validity just as it is construed before deciding infringement." *Markman* v. *Westview Instruments, Inc.*, 52 F.3d 967, 996 n.7 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  And a claim is invalid for indefiniteness only "if its language, when read in light of the specification and the prosecution

history [of the patent], 'fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" *Media Rights Techs., Inc.* v. *Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) (quoting *Nautilus, Inc.* v. *Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014)). For this reason, the Federal Circuit has repeatedly held that the determination of whether a claim is indefinite "requires a construction of the claims according to the familiar canons of claim construction" because "[o]nly after a thorough attempt to understand the meaning of a claim has failed to resolve material ambiguities can one conclude that the claim is invalid for indefiniteness." *All Dental Prodx, LLC* v. *Advantage Dental Prods., Inc.*, 309 F.3d 774, 780 (Fed. Cir. 2002). Likewise *Noah Systems, Inc.* v. *Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012), a case on which Dell relies (*e.g.*, Mot. at 18), acknowledges that "[w]hether a claim complies with the definiteness requirement . . . is a matter of claim construction."

Claim construction sufficient to determine whether a claim is definite or indefinite to one of ordinary skill requires a "properly developed record." *Internet Media Corp.* v. *Hearst Newspapers, LLC*, 2011 WL 2559556, *3 (D. Del. June 28, 2011). Courts have thus recognized that the scope of materials considered on a Rule 12(b)(6) motion, which is limited to determining whether the complaint has alleged facts to support a cognizable legal theory, make it an inappropriate vehicle for claim construction, which is "a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims." *H-W Tech., L.C.* v. *Amazon.com, Inc.*, 2013 WL 3146777, *4  (N.D. Tex. June 20, 2013) (quoting *02 Micro Int'l Ltd.* v. *Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008)).

One thing that precludes claim construction in resolving a motion to dismiss is the need for expert testimony of one skilled in the art. "[T]he focus of the indefiniteness inquiry is on the

meaning that claim terms would have to one of ordinary skill in the art at the time of the invention." *Internet Media*, 2011 WL 2559556, at *3 (internal quotation marks omitted).  As a result, the Federal Circuit has recognized that expert testimony is often necessary to construe claims before determining whether they are indefinite.  For example, in *Seattle Box Co.* v. *Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984), the Federal Circuit determined that a claim's use of the phrase "substantially equal to" did not render the claim indefinite because "the specification clearly set forth" the purpose of the claim limitation, and in light of that purpose "an expert would know" what the term meant.  More recently, the Federal Circuit held in *Media Rights* that expert witness testimony was useful and indeed "need[ed]" to determine whether the information in a patent specification disclosed the required structure corresponding to the claim's means-plus-function elements.  800 F.3d at 1374.  Of course, it is black letter law that expert testimony cannot be considered in deciding a motion to dismiss under Rule 12(b)(6).  *See Occupy Columbia* v. *Haley*, 738 F.3d 107, 116 (4th Cir. 2013); *see also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709 n.9 (3d Cir. 1996) ("Resolution of a battle of expert sources—as defendants expect to occur here—is inappropriate on a motion to dismiss.").

Accordingly, courts have consistently refused to construe patent claims at the motion to dismiss stage.  *See H-W Tech.*, 2013 WL 3146777, at *4 (collecting cases).  More specifically, courts have uniformly refused to resolve indefiniteness invalidity on a motion to dismiss before claim construction, for the same reason.  *See id.* at *5 ("As a ruling on claim construction is still outstanding, the Court should decline to address Defendants' indefiniteness argument upon the present record and at th[e motion to dismiss] stage."); *Internet Media*, 2011 WL 2559556, *3-4 (denying motion to dismiss on indefiniteness because of the lack of a "properly developed record").  In the face of this consistent authority, Dell cannot offer a single case in which a court

decided an indefiniteness challenge on a motion to dismiss prior to claim construction.  In the only case it cites, *In re TLI Communications LLC Patent Litigation,* 87 F. Supp. 3d 773 (E.D. Va. 2015) (Mot. at 15-16), the court decided a consolidated motion to dismiss brought by all of the defendants more than year after the initial complaint was filed, and only after the parties had the opportunity to "fully brief[] their positions on the disputed claim terms pursuant to *Markman*" and the court heard more than 10 hours of oral argument on their meaning.  *Id.* at 782.

Here, the Court has scheduled a series of activities leading to a *Markman* hearing in June regarding the construction of the claim terms.  The process entails the parties proposing their claim construction definitions, submitting their claim construction briefs, and presenting evidence at the *Markman* hearing; that process has not even begun.  It is thus premature to consider the validity of the claims before their meaning has been determined.

A fully developed record will show, without any doubt, that the claims are not indefinite. For example, Plaintiffs will show that the phrase "the average frame rate of the encoded digital signal is substantially equal to $F_s/n_s$" in the '992 and '396 Patent claims is not indefinite in light of the purpose of the limitation in the claim language and as discussed in the patent specification. (Compl. Ex. B ('992 Patent) at 2:4-5.)  For example, the patent specification explains that, if $F_s/n_s$ is not an integer (and because of the flexibility of the system it need not be), then the number of information packets in one frame can be either P' or P'+1.  (*See id.* at 2:22-41.)  The ratio of frames with P' information packets to the total number of frames is varied so that the average frame rate is substantially equal to the value $F_s/n_s$.  Of course, mathematically, it may be impossible to set the ratio of frames with P' information packets to the total number of frames *precisely* equal to the non-integer value of $F_s/n_s$.  (*See id.*)  But one of skill in the art would

understand how close these quantities should be in any particular circumstance, in light of "[t]he purpose of dividing the frames" into information packets in the way described in the patent so that "the average frame rate of the encoded digital signal received is now such that the duration of a frame in the digital signal corresponds to the duration occupied by $n_s$ samples of the wide-band signal." (*Id.* at 2:42-47.)  Here, and in other places, the specification makes clear to one of skill in the art that the frame rate must be substantially equal to the claimed value to permit the most efficient use of the available incoming wide-band signal data in the claimed decoder or receiver, and one of skill in the art would know with reasonable certainty how much variation is permitted for a particular combination of parameters in a given device.  (*See, e.g.*, *id.* at 5:45-6:32 & Figs. 5 & 6 (showing examples).)  *See also Seattle Box*, 731 F.2d at 826 (term not indefinite where "the specification clearly sets forth" the purpose of the claim limitation, because "an expert would know" what the term meant); *Parker Compound Bows, Inc.* v. *Hunter's Mfg. Co.*, 2016 WL 617464, at *20 (W.D. Va. Feb. 12, 2016) (finding term "substantially parallel" not indefinite because "[a] skilled artisan reading these claims in full context would understand, with reasonable certainty, what is claimed here"); *Mobile Telecomm. Techs., LLC* v. *Leap Wireless Int'l, Inc.*, 2015 WL 2250056, at *15 (E.D Tex. May 13, 2015) ("On balance, the specification conveys sufficient context such that a person of ordinary skill in the art would understand the patentee's use of the term 'substantially' with reasonable certainty.).

With respect to the claim elements that use "means" language, the structures corresponding to the means elements in the receiver/decoder claimed in claim 1 of the '992 Patent, and in claim 19 of the '829 Patent, are fully disclosed and described to one of skill in the art throughout the patent specification, including, among other places, in Figures 4 and 12 of the '992 and '829 Patents, and in the section of the specifications of the '992 and '829 Patents

entitled "The Receiver."   (Compl. Ex. B ('992 Patent) at 11:26-13:21; Compl. Ex. C ('829 Patent) at 10:54-12:50); *see, e.g.*, *Noah Sys.*, 675 F.3d at 1312 (specification can express corresponding structure "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure").

In sum, this Court should follow other courts that have considered this issue and decline to consider whether the claims of the Asserted Patents are indefinite until after they have been construed by the *Markman* process, assuming Dell presses its baseless motion at that time.

### III.     THE COMPLAINT ADEQUATELY PLEADS INFRINGEMENT.

Dell devotes nearly an entire page of its brief to discussing the recent elimination of Form 18 of the Federal Rules of Civil Procedure, upon which the Federal Circuit had purportedly relied in holding that the Supreme Court's "plausibility" standard for notice pleading was inapplicable to claims of direct patent infringement.   (Mot. at 20.)   This is a red herring. Regardless of whether the Rules Committee's elimination of Form 18 amounts to a substantive change in the pleading standards for patent cases, that change would have no effect here, since Plaintiffs' 20-page Complaint sets out detailed infringement allegations, going far further than Form 18 or "generally alleg[ing] that [plaintiffs] have patents, that Dell infringes, and that they want money." (Mot. at 2.)  Dell's logic amounts to an attempt to transform the elimination of a pleading Form into a requirement that patent complaints include claim constructions, claim charts, and infringement contentions.   But the standard set forth by Rule 8 and the Supreme Court's decisions in *Twombly* and *Ashcroft* v. *Iqbal*, 556 U.S. 662, 677-78 (2009) requires a "short and plain statement of the claim" showing "plausibility," and nothing more.

### A.      Plaintiffs' Allegations of Direct Infringement Are Plausible.

Dell does not dispute that its computers are capable of decoding MPEG Audio-encoded signals such as MP3s.  Dell nonetheless argues that the Complaint has failed to adequately plead direct infringement, raising factual disputes that cannot be resolved on this motion.

The Federal Circuit has held that "a district court may rely on an industry standard in analyzing infringement."  *Fujitsu*, 620 F.3d at 1327.  "If a district court construes the claims and finds that the reach of the claims includes any device that practices a standard, then this can be sufficient for a finding of infringement."  *Id.*; *see also On Track Innovations Ltd.* v. *T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 378-79 (S.D.N.Y. 2015) ("[I]t is appropriate to analyze the mandatory standards with which these phones must necessarily comply.").  This theory of infringement is adequately pled by the Complaint.

*First*, the Complaint alleges that any device that complies with the MPEG Standards— such as Dell's devices—necessarily infringes each of the Asserted Patents.  "[P]roducts capable of decoding an audio signal that has been encoded in compliance with the MPEG Standards (e.g., an MP3 file) necessarily infringe [each patent]."  (Compl. ¶¶ 29, 32, 34-35, 39; *see also id.* ¶ 25 ("The Asserted Patents cover inventions that are essential—required—for implementation of the MPEG Standards.").)  Moreover, the Complaint specifically identifies at least one claim of each of the Asserted Patents that covers technology essential to the MPEG Standards.  (*Id.* ¶¶ 29, 32, 34-35, 39.)

*Second*, the Complaint alleges that certain Dell computers contained unlicensed software that complied with the MPEG Standards.  More specifically, the Complaint alleges that Dell "advertises, manufactures and/or sells products that contain unlicensed software that complies with the MPEG Standards."  (*Id.* ¶ 44.)  The Complaint identifies examples of both this software

(Cyberlink PowerDVD and Roxio Creator) and specific examples of the Dell computer models that contained this software.[10]

**Finally**, the Complaint alleges that "[b]ecause the [Dell] MPEG Audio Products comply with the MPEG Audio Standards, they infringe at least the claims referred to above of the Asserted Patents." (*Id.* ¶ 45.)  Under *Fujitsu*, this is a valid theory of infringement.  Taking these allegations as true, the Complaint plausibly alleges infringement.

Dell argues that it is improper for Plaintiffs to "compare[] the Asserted Patents to the MPEG Standards." (Mot. at 7.)  But *Fujitsu* held that "if an accused product operates in accordance with a standard, then comparing the claims to that standard is the same as comparing the claims to the accused product." 620 F.3d at 1327.  Dell also seizes on *Fujitsu*'s observation that "*in many instances*, an industry standard does not provide the level of specificity required to establish that practicing that standard would always result in infringement." (Mot. at 23 (quoting *Fujitsu*, 620 F.3d at 1327).)  But Plaintiffs' Complaint sets forth in detail how the MPEG Standards were written specifically to implement Plaintiffs' inventions that were patented under the patents-in-suit. (*See* Compl. ¶¶ 19-21, 24-40.)  It is true that, at *trial*, Dell is "free to either prove that the claims do not cover all implementations of the standard or to prove that it does not practice the standard." *Fujitsu*, 620 F.3d at 1327.  But at the pleading stage, Plaintiffs need only plausibly allege that Dell's practice of the standard results in infringement of the patents. *See Republican Party of N.C.* v. *Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (a motion to dismiss

---

[10]     As the Complaint notes, without discovery from Defendant, Plaintiffs are not able to ascertain at the pleading stage all of Dell's infringing products.  (Compl. ¶ 44.)

"does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."). Plaintiffs have done that here.[11]

Dell also asserts that the Complaint "is . . . silent about how the Cyberlink Power DVD and Roxio Creator software supposedly infringes the Asserted Patents" and "do[es] not even plead that the accused Cyberlink and Roxio Creator software packages operate and function in the same manner." (Mot. at 6-7, 23.) These are straw men: Plaintiffs have adequately alleged that any receiver or decoder (such as Dell's devices that decode MPEG signals) cannot comply with the MPEG Standards without also infringing Plaintiffs' patents, and Dell does not dispute that the software incorporated in Dell devices "complies with the MPEG Standards," as alleged in the Complaint. (Compl. ¶ 44.)[12]

---

[11]    Apart from *Fujitsu*, Dell cites only two inapposite cases in support of its argument that Plaintiffs have failed to adequately plead direct infringement. (Mot. at 23.) In *WiAV Networks, LLC* v. *3Com Corp.*, 2010 WL 3895047, at *1 (N.D. Cal. Oct. 1, 2010), the only issue was whether 12 wholly unrelated computer manufacturers were properly joined as defendants. In *dicta*, that court misconstrued *Fujitsu* by suggesting that "only in situations where a properly construed patent covers *all required elements* of an industry standard will it be enough to prove infringement by showing compliance with the standard." *Id.* at *2. The logical inference of *Fujitsu* goes the other way: required elements of an industry standard must embrace *all of the elements of a particular claim* in order for that patent to be essential to the standard, but other unclaimed inventions may *also* be required by the standard without rendering the patent non-essential. *See Fujitsu,* 620 F.3d at 1327. *Linex Technologies, Inc.* v. *Belkin International*, 628 F. Supp. 2d 703, 705 (E.D. Tex. 2008), decided before *Fujitsu*, did not concern sufficiency of pleading, but rather addressed the sufficiency of the plaintiff's infringement contentions under local patent rules. The *Linex* court acknowledged that *certain* industry standards might be "sufficiently particular to alone be the basis for infringement cases," but held the 802.11n standard at issue was not "sufficiently particular" and the plaintiff had not set forth "how an 802.11n-compliant device would necessarily infringe" the patents. *Id.* at 708-09.

[12]    Although Dell does not cite any authority for the proposition that the software must "operate and function in the same manner" (Mot. at 23), this appears to be a misreading of a single phrase in *Fujitsu*. The Federal Circuit stated that "[i]f two products undisputedly operate in the same manner, a finding of infringement against one will create a persuasive case against the other." *Fujitsu*, 620 F.3d at 1327. Read in context, the phrase "operat[ing] in the same manner" clearly refers to a situation in which both products operate in compliance with the same industry standard. Indeed, the preceding paragraph of *Fujitsu* states "if an accused product

*(footnote continued)*

-24-

Dell's remaining challenges to Plaintiffs' direct infringement allegations are factual disputes that cannot be resolved on this motion.  For example, Dell argues that the equation present in Section 2.4.3.1 of ISO/IEC 11172-3 "does not resemble the claimed formula in the Asserted Patents" because "the equation in Section 2.4.3.1 has only two variables, and the formula in claim 26 of the '396 patent has four variables."  (Mot. at 23-24.)  As the Court knows, the same formula can be expressed in different ways; whether the formula contained in the relevant standard is equivalent to the formula in the claims of the '396 Patent is an issue for resolution after claim construction and discovery, with the assistance of experts.  Likewise, Dell argues that certain claim terms of the '992 Patent and limitations of the '829 Patent do not appear in the MPEG Standards.  (Mot. at 24-25.)  These, too, are factual disputes.

Dell also asserts that "it is certainly possible that whatever structures Audio MPEG identifies as allegedly responsible for infringing the Asserted Patents were obtained by Dell from a licensed supplier" and therefore "the Complaint's mere conclusory allegation that the accused products are 'unlicensed' is insufficient to plausibly plead infringement."  (Mot. at 25.)  But there is nothing implausible about Plaintiffs' allegation, which must be taken as true, that Cyberlink and Roxio products are "*unlicensed* software that complies with the MPEG Standards." (Compl. ¶ 44 (emphasis added).)  That is sufficient at this stage.

### B.    The Complaint Adequately Pleads Indirect Infringement.

Dell's arguments that Plaintiffs have failed to adequately plead either contributory or induced infringement misstate the Complaint and applicable law.  (Mot. at 25-28.)

---

*(footnoted continued)*
*operates in accordance with a standard*, then comparing the claims to that standard is the same as comparing the claims to the accused product."  *Id.* (emphasis added).

1.      **Plaintiffs' Allegations that Dell Induced Infringement Are
           Plausible.**

Under Section 271(b), "[w]hoever actively induces infringement of a patent shall be
liable as an infringer."  35 U.S.C. § 271(b).  In order to plead inducement, in addition to direct
infringement (discussed *supra* at 22-25), the Complaint must allege that "the alleged infringer
knowingly induced infringement and possessed specific intent to encourage another's
infringement."  *MEMC Elec. Materials, Inc.* v. *Mitsubishi Materials Silicon Corp.*, 420 F.3d
1369, 1378 (Fed. Cir. 2005) (internal quotation marks omitted).  Plaintiffs' allegations are more
than sufficient at this pleading stage.

The Complaint specifically alleges that Dell's acts of inducement include "Dell's
promotions on its websites and marketing materials for Defendant's infringing products and their
MPEG Audio, MP2, or MP3 capabilities" (Compl. ¶ 52), defeating Dell's argument that
Plaintiffs have failed to make the requisite allegations "that Dell specifically promoted or
encouraged use of the allegedly patented 'capabilities.'"  (Mot. at 27.)  And Dell does not argue
that these allegations are implausible—nor could it:  computer manufacturers like Dell routinely
touted the multimedia capabilities of their computers, including the abilities to download, store,
and play DVDs and MP3s.  That is sufficient to establish "specific intent."  "Evidence of active
steps taken to encourage direct infringement, such as advertising an infringing use or instructing
how to engage in an infringing use, show an affirmative intent that the product be used to
infringe."  *MEMC*, 420 F.3d at 1379 (quoting *Metro-Goldwyn-Mayer Studios Inc.* v. *Grokster,
Ltd.*, 545 U.S. 913, 915 (2005)).

2.      **Plaintiffs' Allegations of Contributory Infringement Are
           Plausible.**

To plead contributory infringement, the Complaint must allege (i) "that there is direct
infringement," (ii) "that the accused infringer had knowledge of the patent," (iii) "that the

component has no substantial noninfringing uses," and (iv) "that the component is a material part

of the invention." *Fujitsu*, 620 F.3d at 1326.  In its brief, Dell does not dispute Plaintiffs'

allegations of Dell's knowledge of the patent.  Rather, Dell argues that the Complaint "does not

sufficiently . . . identify[] a component with no substantial non-infringing uses," and that the

"important component" Dell provided is "not identified in the Complaint." (Mot. at 27.)  This

argument is plainly contradicted by the Complaint:

> Defendant has contributed to direct infringement of the patent by
> supplying an important component of the infringing products to
> others in the United States.  ***Specifically, Defendant supplied***,
> sold, and/or offered to sell in the United States ***components***
> ***providing the capabilities required by the MPEG Standards,***
> ***including but not limited to software such as Cyberlink***
> ***PowerDVD and Roxio Creator***, for use with computers and
> electronic devices, including but not limited to Dell computers and
> electronic devices. The components providing the capabilities
> required by the MPEG Standards are not common components
> suitable for substantial non-infringing use.

(Compl. ¶ 53 (emphasis added); *see also id.* ¶¶ 62, 71.)[13]

### C.  Plaintiffs' Allegations that Dell Willfully Infringed Their Patents Are Plausible.

"[T]o plead willful infringement, a plaintiff need only 'allege '(1) infringement of the

patent-in-suit; and (2) pre-filing knowledge of the patent-in-suit by the defendant.'" *Va.*

---

[13]    Dell also contends that Plaintiffs' allegation that the "unidentified components" lack
substantial non-infringing use is "a mere conclusion." (Mot. at 27.)  But Plaintiffs allege that
such software "complies with the MPEG Standards" and that any product complying with those
standards necessarily infringes the Asserted Patents. (Compl. ¶ 44.)  Even if the software has
other uses, only the MPEG Audio-related functions are relevant to this analysis, and unlicensed
products that comply with the MPEG Standards have no non-infringing uses. *See i4i Ltd. P'ship*
v. *Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010) ("[A] particular tool within a larger
software package may be the relevant 'material or apparatus' when that tool is a separate and
distinct feature."); *Lucent Techs., Inc.* v. *Gateway, Inc.*, 580 F.3d 1301, 1321 (Fed. Cir. 2009)
("Because Microsoft included the date-picker tool in Outlook, the jury could reasonably
conclude, based on the evidence presented, that Microsoft intended computer users to use the
tool—perhaps not frequently—and the only intended use of the tool infringed the Day patent.").

*Innovation Scis., Inc.* v. *Samsung Elecs. Co., Ltd.*, 983 F. Supp. 2d 700, 708 (E.D. Va. 2013) (quoting *Mitutoyo Corp.* v. *Cent. Purchasing, LLC*, 499 F.3d 1284, 1290 (Fed. Cir. 2007)). Here, Plaintiffs have adequately alleged infringement of the Asserted Patents (*see supra* at 22-25) and that Dell has had actual knowledge of the Asserted Patents since at least July 1, 2004, when Audio MPEG notified Dell of its infringing activity.  (Compl. ¶¶ 54, 63, 72.)

In order to attack Plaintiffs' allegations of willfulness, Dell again has conflated pleading with proof.  Dell cites *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) for the proposition that "[w]illful infringement requires a showing that (1) 'the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent' and (2) 'this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer.'"  (Mot. at 28 (quoting *Seagate*, 497 F.3d at 1371).)

But "*In re Seagate* only addressed the evidence necessary to *establish* willful infringement, not the prerequisites for *pleading* willful infringement."  *Va. Innovation*, 983 F. Supp. 2d at 707 (internal quotation marks omitted) (emphasis in original); *see also id.* at 706 ("*[A]llegations* pertaining to an 'objectively high likelihood' of infringement are not required to survive a motion to dismiss."); *FuzzySharp Techs. Inc.* v. *Nvidia Corp.*, 2013 WL 4766877, at *3 (N.D. Cal. Sept. 4, 2013) ("[E]vidence pertaining to the defendant's objective knowledge of its infringement . . . must be analyzed in conjunction with the defenses available to the defendant, which are not at issue in a 12(b)(6) motion."); *Paice LLC* v. *Hyundai Motor Co.*, 2013 WL 1316318, at *4 & n.19 (D. Md. Mar. 27, 2013) (collecting cases).  The standard for *pleading* willful infringement is set forth in a Federal Circuit opinion issued a few weeks after *Seagate* and authored by the same judge.  *See Va. Innovation*, 983 F. Supp. 2d at 705.  That opinion "requires only that a plaintiff *allege* (1) infringement of the patent-in-suit; and (2) pre-filing 'knowledge'

of the patent-in-suit by the defendant." *Id.* (citing *Mitutoyo*, 499 F.3d at 1290).[14]   Other than *Seagate* (which involved a discovery dispute), the cases cited by Dell in support of its willfulness argument all involved post-trial motions for judgment as a matter of law.  *Powell*, 663 F.3d at 1227; *Uniloc USA Inc.* v. *Microsoft Corp.*, 632 F.3d 1292, 1295 (Fed. Cir. 2011); *Bard Peripheral Vascular, Inc.* v. *W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1007 (Fed. Cir. 2012).

In any event, Plaintiffs have adequately pled willfulness, even if *Seagate* is relevant at the pleading stage (and it is not).  *See St. Clair Intellectual Prop. Consultants, Inc.* v. *Hewlett-Packard Co.*, 2012 WL 1134318, at *2-3 (D. Del. Mar. 28, 2012) (following *Seagate* but nonetheless denying motion to dismiss).  The Complaint alleges that there was an "objectively high likelihood that [Dell] was infringing" each Asserted Patent, and that "the risk of infringement was obvious such that, even if Defendant did not know of the risk of infringement, it should have known of the risk."  (Compl. ¶¶ 54, 63, 72.)  Although Dell asserts that "this motion to dismiss demonstrates that there is an objectively reasonable basis for arguing that these claims are invalid and therefore that Dell cannot infringe these claims" (Mot. at 29), those factual disputes are not sufficient to render Plaintiffs' allegations implausible at the pleading stage.

Respectfully submitted,

Dated:  March 31, 2016

/s/ Stephen E. Noona
Stephen E. Noona
Virginia State Bar No. 25367

---

[14]   Dell also argues that "the first prong of the *Seagate* test is an objective inquiry, to be decided by the court as a matter of law."  (Mot. at 28.)  This misstates the law, and certainly does not support resolving this issue on this motion.  The Federal Circuit has held that "whether an accused infringer's reliance on a particular issue or defense is reasonable is a question for the court *when the resolution of that particular issue or defense is a matter of law*."  *Powell* v. *Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed. Cir. 2011) (emphasis added).  By contrast, "[w]hen the resolution of a particular issue or defense is a factual matter . . . whether reliance on that issue or defense was reasonable under the objective prong is properly considered by the jury."  *Id.* at 1336-37.

KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (888) 360-9092
senoona@kaufcan.com

Garrard R. Beeney (*pro hac vice*)
Stephen J. Elliott (*pro hac vice*)
W. Rudolph Kleysteuber (*pro hac vice*)
Michael P. Devlin (*pro hac vice*)
Jamie L. Kringstein (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
beeneyg@sullcrom.com
elliotts@sullcrom.com
kleysteuberr@sullcrom.com
devlinm@sullcrom.com
kringsteinj@sullcrom.com

*Attorneys for Plaintiffs Audio MPEG, U.S.
Philips Corp., TDF SAS, and Institut für
Rundfunktechnik GmbH*

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2016, I will electronically file the foregoing with

the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to the following:

Charles B. Molster, III
Virginia State Bar No. 23613
Attorney for Defendant Dell Inc.
WINSTON & STRAWN LLP
1700 K Street NW
Washington, DC 20006
T: (202) 282-5000
F: (202) 282-5100
cmolster@winston.com

Kimball R. Anderson (*pro hac vice*)
Kathleen B. Barry (*pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-5600
T: (312) 558-5600
F: (312) 558-5700
kanderson@winston.com
kbarry@winston.com
*Attorneys for Defendant Dell Inc.*

William R. Poynter
Virginia State Bar No. 48672
KALEO LEGAL
4456 Corporation Lane, Suite 135
Virginia Beach, VA 23462
Telephone: (757) 965-6804
Facsimile: (757) 304-6175
wpoynter@kaleolegal.com

John P. Corrado
Virginia State Bar No. 20247
BAKERHOSTETLER
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 861-1500
Facsimile: (202) 861-1783

jcorrado@bakerlaw.com
*Counsel for Defendant HP, Inc.*

/s/ Stephen E. Noona
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (888) 360-9092
senoona@kaufcan.com

*Attorneys for Plaintiffs Audio MPEG, U.S.*
*Philips Corp., TDF SAS, and Institut für*
*Rundfunktechnik GmbH*